EnterIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Nicholas Gomez, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | No. 12 C 4804 |
| | ) | |
| v. | ) | Judge Bucklo |
| | ) | |
| K. Kruger (Star no. 17501), *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Jesus "Mike" Castrejon ("Castrejon"), Omar Nazario ("Nazario"), Edwin Mercado ("Mercado"), Osmar Rodriguez ("Rodriguez"), and Nicholas Gomez ("Gomez") have sued a group of twelve Chicago police officers ("defendants," "the officers") and the City of Chicago.[1] The suit arises in connection with plaintiffs' arrest by defendants during an altercation in Chicago's Humboldt Park neighborhood. Plaintiffs allege several violations of their civil rights under 42 U.S.C. § 1983, as well as various causes of action under Illinois law. Defendants have moved for partial summary judgment with respect to certain of the claims asserted by plaintiffs Castrejon and Nazario. For the reasons discussed below, the motion is granted in part and denied in part.

---

[1] The officers are Sergeants K. Kruger, W. Grassi, and J. Schachelmayer; and Officers J. Cerda, M. Chernik, S. Corona, R. Delany, G. Frear, M. Mannott, J. Rodriguez, R. Trotter, and J. Zambrano.

I.

On the evening of June 16, 2011, Rodriguez, Nazario, and Gomez were working at a barbershop. Rodriguez witnessed two individuals, whom he believed to be gang members, standing in front of the barbershop and flashing gang signs at passing cars. He asked the gang members to leave, and when they refused, he asked one of his fellow barbers to call the police.

Between five and ten minutes later, two Chicago police officers arrived on the scene. Although the putative gang members soon left, other officers continued to arrive on the scene until about thirty officers were present. Plaintiffs claim that the officers began lining up and putting on gloves. Castrejon, one of the barbershop's customers, stepped outside to see what was going on. He testified that it looked like the police were "ready for war" and that he feared for his life. Pls.' L.R. 56(b)(3)(C) Stmt. ¶ 7. At Rodriguez's suggestion, Castrejon began to record the events on his cell phone.

The video, which lasts approximately fifty-three seconds, shows several police officers standing outside of the barbershop. *See* Defs'. Ex. E, Castrejon Cell Phone Recording. The officers appear to be speaking with one another and with civilians. Castrejon can be heard commenting on events as he pans his cell phone around the scene. During the recording, he makes several references to Rodney King, the motorist whose beating in 1991 by Los Angeles police officers was captured on video, ultimately leading to the criminal conviction of certain of the officers for violating King's constitutional rights. As discussed more fully below, the parties dispute precisely what Castrejon said and what his references to Rodney King meant. According to plaintiffs, Castrejon said, "It's going to be some Rodney King." Pls.' Resp. Br. at 2. They claim

that Castrejon was expressing concern about impending police brutality. According to defendants, Castrejon said, "[L]et's see some Rodney King shit up in here!" *See* Defs.' Reply Br. at 4. They contend that Castrejon was seeking to instigate a confrontation with the police.

It is undisputed that Sergeant Karl Kruger ("Kruger") and other officers informed Castrejon that he did not have their permission to record them. It is also undisputed that Castrejon nonetheless continued to record. Near the end of the video, Kruger can be heard telling Castrejon to put the phone away. Kruger then says to Castrejon, "You put your hands on me, motherfucker? You put your fucking hands on me?" Defs.' Ex. E; *see also* Defs.' Ex. B, Trial Tr. at 91:17-19 (Kruger testifying that these statements were made by him). A scuffle ensues, and the recording abruptly ends.

According to plaintiffs, Kruger at this point "launched at Castrejon and pinned him against the window of the barbershop and smacked Castrejon's phone while another officer plowed Castrejon in the ribs." Pls.' L.R. 56.1(b)(3)(C) Stmt. ¶ 10. Defendants deny that Kruger "launched" at Castrejon or smacked his phone, or that anyone "plowed" Castrejon in the ribs. They say that Kruger pushed Castrejon against the window after Castrejon grabbed Kruger's wrist and punched Kruger in the chest. Defs.' Resp. to Pls.' 56. Stmt. ¶¶ 10, 35.

Once the altercation broke out between Kruger and Castrejon, a full-blown melee ensued. Sergeant William Grassi ("Grassi") told the officers to "Get everybody!" and the officers converged on the barbershop and began arresting people. In addition to Castrejon, several other plaintiffs claim that the officers used excessive force in arresting them. As relevant here, Nazario alleges that the officers dragged him from the

foyer of the barbershop and proceeded to kick him in the face and head, strike him with a baton on his back and neck, and shoot him twice in the buttocks with a taser gun. Pls.' Resp. Br. at 3; Pls.' L.R. 56.1 Stmt. ¶¶ 14-16. Defendants deny these allegations and claim that Nazario was arrested because he rushed at a group of officers and tried to punch Sergeant Grassi. Defs.' Resp. to Pls.' L.R. 56.1 Stmt. ¶¶ 14-16.

Eventually, all of the plaintiffs were placed under arrest. All were charged with resisting/obstructing a peace officer; and all except Castrejon were charged with mob action. Nazario and Castrejon were additionally charged with aggravated battery; and Castrejon was charged with violating Illinois' eavesdropping statute based on his recording of the officers without their consent. All of the resisting/obstructing and mob action charges were ultimately dropped. After a preliminary hearing, a state court found probable cause for the eavesdropping charge against Castrejon and the aggravated battery charges against both Castrejon and Nazario. *See* Preliminary Hr'g Trans., Defs.' Ex. I at 21:22. The eavesdropping charge was later dropped, and in November 2016, Castrejon and Nazario were tried and acquitted on the aggravated-battery charges.

Plaintiffs' complaint asserts nine causes of action. Four of these allege violations of 42 U.S.C. § 1983: excessive force (Count I); failure to intervene (Count II); unlawful seizure/false arrest (Count III); and illegal pretrial detention (Count IV). The remaining claims arise under Illinois state law: assault (Count V); battery (Count VI); malicious prosecution (Count VII); indemnification (Count VIII); and conspiracy (Count IX).[2]

_____

[2] The false-arrest and malicious-prosecution claims (Counts III and VII, respectively) are asserted by all of the plaintiffs; the excessive-force, assault, and battery claims (Counts I, V, and VI, respectively) are asserted by Castrejon, Nazario, Gomez, and Rodriguez; and the failure-to-intervene, illegal-pretrial-detention, and conspiracy claims (Counts II, IV, and IX, respectively) are asserted by Castrejon and Nazario.

Defendants move for summary judgment as to Castrejon's § 1983 claims for failure to intervene, false arrest, and illegal pretrial detention, and well as Castrejon's and Nazario's conspiracy claim. The motion is granted as to Castrejon's § 1983 claims and denied without prejudice as to the conspiracy claim.

II.

**A.    Castrejon's Claims for False Arrest, Failure to Intervene, and Illegal Pretrial Detention**

Castrejon's claims for failure to intervene (Count II), false arrest (Count III) and illegal pretrial detention (Count IV) are interrelated: the false-arrest claim alleges that Castrejon was arrested without probable cause for eavesdropping; his failure-to-intervene claim alleges that defendants failed to prevent the false arrest, 3d Am. Compl. ¶ 50; and his illegal-pretrial-detention claim alleges that he was wrongly detained based on the false arrest, *id*. ¶ 57. Thus, the parties' briefing proceeds on the assumption that if Castrejon's false arrest-claim fails, his failure-to-intervene and illegal-pretrial-detention claims fail as well. *See* Defs.' Br. at 7-8; Pls.' Resp. Br. at 7 n.2.

"To prevail on a false-arrest claim under § 1983, a plaintiff must show that there was no probable cause for his arrest." *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016). "Probable cause to arrest exists if the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013).

Defendants argue that there was probable cause to arrest Castrejon for violating Illinois' eavesdropping statute because it is undisputed that he knowingly recorded the officers on his cell phone without their consent. Defendants further contend, however,

that even if probable cause for the arrest was lacking, they are entitled to summary judgment on Castrejon's false-arrest claim under the doctrine of qualified immunity. While the "probable-cause standard inherently allows room for reasonable mistakes ... qualified immunity affords an added layer of protection by shielding officers from suit for damages if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (citation, brackets, and quotation marks omitted). "Often termed 'arguable probable cause,' qualified immunity in this context protects officers who reasonably but mistakenly believe that probable cause exists." *Id*. at 714-15 (citation omitted).

The qualified immunity standard is a "demanding" one, *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018), and "the plaintiff has the burden of defeating it once the defendants raise it," *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). To overcome defendants' assertion of qualified immunity, "the plaintiff must show (1) that the defendant violated a constitutional right, when construing the facts in the light most favorable to the plaintiff, and (2) that the right was clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that her conduct was unlawful." *Id.* at 613. Courts have discretion to address the two prongs of the qualified immunity inquiry in either order. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009). Because plaintiffs advance the same arguments as to both prongs, and because the second prong is dispositive here, I need only address the question of whether defendants violated a clearly established right — or, put differently, whether,

under the circumstances in question, Sergeant Kruger had arguable probable cause to arrest Castrejon for eavesdropping.

"A plaintiff can show that a right is 'clearly established' by statute or constitution in at least two ways: (1) he can point to a clearly analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was 'so egregious that no reasonable person could have believed that it would not violate established rights.'" *Beaman v. Freesmeyer*, 776 F.3d 500, 508–09 (7th Cir. 2015) (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)). Here, plaintiffs cite no case authority to show that Kruger lacked arguable probable cause to arrest Castrejon for eavesdropping. Accordingly, plaintiffs have the burden of showing that Castrejon's arrest for eavesdropping was so egregious that no reasonable person could have failed to realize that it violated clearly established rights. Plaintiffs have failed to meet this burden.

Plaintiffs begin by arguing that Kruger could not reasonably have believed that he had probable cause (or arguable probable cause) to arrest Castrejon for eavesdropping because, by its plain terms, the statute applies only to the recording of "conversations." At the time in question, the eavesdropping law provided that a "person commits eavesdropping when he...[k]nowingly and intentionally uses an eavesdropping device for the purpose of hearing or recording all or any part of any conversation ... unless he does so ... with the consent of all of the parties to such conversation." 720 ILCS 5/14-2(a)(1)(A).[3] According to plaintiffs, Castrejon's purpose in making the cell phone video

---

[3] As discussed in greater detail below, the constitutionality of the eavesdropping statute was brought into question by the Seventh Circuit decision in *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), and was ultimately declared

was not to record the officers' conversations. Rather, they maintain, "[b]y filming openly and referencing Rodney King, Castrejon expressed his objective: to capture the Defendants' violent crimes against him and to deter them from committing those crimes under the threat of being caught on film." Pls.' Resp. Br. at 8. As evidence that Kruger himself did not believe that Castrejon's purpose was to record conversations, plaintiffs point out that the criminal complaint charging Castrejon with eavesdropping makes no reference to "conversations." The offense description says only that Castrejon "'knowingly used an eavesdropping audio and video recording device to record police officers acting within their official duties, without having their consent.'" Pls.' Resp. Br. at 8-9 (citing Defs.' Ex. F, Eavesdropping Criminal Complaint).[4] Additionally, plaintiffs cite Kruger's deposition testimony that he could not remember hearing any conversations between police officers at the time of the incident. *See* Pls.' Ex. U, K. Kruger Dep. at 114:10-14.

This argument is unpersuasive. To begin with, it is irrelevant whether Kruger himself actually believed that Castrejon's purpose in recording the officers was to

_____

unconstitutional by the Illinois Supreme Court in *People v. Clark*, 6 N.E.3d 154, 162 (Ill. 2014). As a result, the law was amended in 2014. *See* P.A. 99-352, § 20-155, eff. Jan. 1, 2016. For purposes of this motion, only the version in effect at the time of Castrejon's arrest is relevant.

[4] I note although the original typewritten description of the offense includes no reference to the recording of a conversation, portions of the description were later crossed-out and replaced with handwritten notations that *do* refer to a "conversation." When the handwritten edits are taken into account, the description says that Castrejon "knowingly used an eavesdropping device to record all or any part of a conversation, to wit: to record police officers acting within their official duties, without having their consent." Defs.' Ex. F. However, defendants do not mention the handwritten changes to the document and do not dispute plaintiffs' assertion that the eavesdropping complaint includes no reference to conversations.

capture their conversations. The test for arguable probable cause, like the test for ordinary probable cause, is objective. *See, e.g.*, *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1060 (8th Cir. 2013) ("[T]he existence of probable cause or arguable probable cause depends on the viewpoint of an objectively reasonable officer, not the viewpoint of the particular arresting officer.") (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). The question is thus not whether Kruger believed that Castrejon's purpose in making the video was to capture the officers' conversations; it is whether an officer in Kruger's position could reasonably have believed that Castrejon's purpose was to capture the conversations.

The deeper problem with plaintiffs' argument, however, is that it construes the term "conversation" far too narrowly. Although plaintiffs are not entirely clear on this point, they appear to interpret "conversation" in the everyday sense as a discussion between two or more people about some topic or other. *See, e.g.*, *Conversation*, Cambridge Dictionary (defining "conversation" as "an informal, usually private, talk in which two or more people exchange thoughts, feelings, or ideas, or in which news or information is given or discussed"), https://dictionary.cambridge.org/us/dictionary/english/conversation. Plaintiffs offer no basis for such an interpretation, however, and indeed they ignore the definition provided in the statute itself. Section 5/14-1(d) of the eavesdropping law defines "conversation" as "*any* oral communication between 2 or more persons regardless of whether one or more of the parties intended their communication to be of a private nature under circumstances justifying that expectation." 720 Ill. Comp. Stat. Ann. 5/14-1(d) (emphasis added). Given the breadth of this definition, plaintiffs have failed to explain why Kruger could not

9

reasonably have believed that Castrejon was recording "conversations" within the meaning of the statute. Castrejon's video plainly captured "oral communications" by Kruger and other officers at the scene.

That the eavesdropping statute's definition of "conversation" should be understood broadly – or at any rate, broadly enough to encompass Castrejon's recording – draws additional support from the Seventh Circuit's decision in *American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012). In *Alvarez*, the Illinois ACLU sought a preliminary injunction to prevent the Cook County State's Attorney from prosecuting participants in its "police accountability program" under the eavesdropping statute. A key part of the program was to "openly make audiovisual recordings of police officers performing their duties in public places and speaking at a volume audible to bystanders." *Id*. at 586. The ACLU claimed that application of the eavesdropping statute to criminalize their recordings would violate the First Amendment.

The Seventh Circuit held that the preliminary injunction was warranted, concluding that the ACLU had shown a likelihood of success on the merits of its first amendment challenge to the eavesdropping law. In reaching this conclusion, the court emphasized the wide range of communications covered by the law. The court noted, for example, that, "[u]nlike the federal wiretapping statute and the eavesdropping laws of most other states, the gravamen of the Illinois eavesdropping offense is not the secret interception or surreptitious recording of a private communication." *Id*. at 595. "Instead," the court explained, "the statute sweeps much more broadly, banning all audio recording of any oral communication absent consent of the parties regardless of

whether the communication is or was intended to be private." *Id*.; *see also id*. at 586-87 ("Illinois has criminalized the nonconsensual recording of most any oral communication, including recordings of public officials doing the public's business in public and regardless of whether the recording is open or surreptitious."). Under the court's interpretation in *Alvarez*, the communications captured by Castrejon's recording can reasonably be regarded as "conversations" within the meaning of the eavesdropping statute.

I pause here to note that *Alvarez*'s holding regarding the eavesdropping statute's unconstitutionality does not negate the existence of probable cause (or arguable probable cause) for Castrejon's arrest. Nor is defendants' qualified immunity argument defeated by the fact that several Illinois state courts, including the Illinois Supreme Court, have declared the statute unconstitutional. *See People v. Clark*, 6 N.E.3d 154, 156 (Ill. 2014); *People v. Melongo*, 6 N.E.3d 120 (Ill. App. Ct. 2014); *People v. Drew*, No. 10–cr–46 (Cook Cnty., Ill., Cir. Ct. Mar. 7, 2012); *People v. Allison*, No. 2009–CF–50 (Crawford Cnty., Ill. Cir. Ct. Ill., Cir. Ct.  Sept. 5, 2011). As an initial matter, plaintiffs themselves do not advance this argument – despite the defendants' anticipation of the issue in their opening brief. Accordingly, plaintiffs have forfeited any argument based on the statute's unconstitutionality. *See, e.g.*, *Salas v. Wisconsin Dep't of Corr*., 493 F.3d 913, 924 (7th Cir. 2007) (party forfeits any argument it fails to raise in response to summary judgment). In any case, an arrest based on a good-faith reliance on a law remains valid even if that law is later declared invalid. *See, e.g.*, *United States v. Charles*, 801 F.3d 855, 861 (7th Cir. 2015) ("It's true that Chicago's handgun ban was later invalidated, as was the Illinois concealed-carry law. But the '[p]olice are charged to

enforce laws until and unless they are declared unconstitutional,' so a search based on a violation of a law later declared unconstitutional does not necessarily violate the Fourth Amendment.") (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979)) (citations omitted); *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012) ("[A]n arrest made in good-faith reliance on an ordinance is valid regardless of a subsequent judicial determination of its unconstitutionality.") (citations omitted).

To be sure, probable cause cannot be based on a law that is "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *DeFillippo*, 443 U.S. at 36. But the eavesdropping statute does not meet that standard. Notably, Judge Posner filed a dissent in *Alvarez* defending the eavesdropping law's constitutionality. *See Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 608 (7th Cir. 2012) (Posner, J., dissenting). Given that the *Alvarez* panel itself was divided over the question, it is difficult to conclude that the law's unconstitutionality should have been obvious to "any person of reasonable prudence."[5] In addition, prior to *Alvarez*, several individuals had been prosecuted under the

---

[5] I note that other circuits have reached different conclusions regarding whether the constitutionality *vel non* of other state eavesdropping statutes was clearly established for qualified immunity purposes. *Compare Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010) ("[W]e conclude there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment."); and *Szymecki v. Houck*, 353 F. App'x 852, 853 (4th Cir. 2009 (affirming district court's conclusion that the "First Amendment right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct"), *with Glik v. Cunniffe*, 655 F.3d 78, 88 (1st Cir. 2011) (no arguable probable cause to arrest for violating state eavesdropping law where plaintiff "was openly recording the police officers and that they were aware of his surveillance").

eavesdropping statute for recording police officers in the course of their official duties. *See Alvarez*, 679 F.3d at 593 n.2 (collecting cases). This, too, militates against the notion that the law's unconstitutionality should have been obvious. *See, e.g., Frobe v. Vill. of Lindenhurst*, No. 11 C 1722, 2014 WL 902878, at *5 (N.D. Ill. Mar. 7, 2014) (citing prior prosecutions under the eavesdropping statute in rejecting plaintiff's contention that Illinois' eavesdropping law was so grossly unconstitutional that it could not have provided probable cause for his arrest).

I am unconvinced, then, by plaintiffs' argument that Kruger lacked arguable probable cause to arrest Castrejon because Castrejon's cell phone recording did not record "conversations" within the meaning of the eavesdropping law. Even assuming that the officers' communications were not in fact "conversations" for purposes of the statute, it would not have been unreasonable for Kruger to have believed that they were. Indeed, given that the probable-cause standard allows for reasonable mistakes of law, Kruger may well have had ordinary probable cause for the arrest. *See, e.g., Gutierrez*, 722 F.3d at 1008 ("Based as it is on probabilities rather than hard certainties, the probable-cause standard inherently allows room for reasonable mistakes.") (citing *Brinegar v. United States*, 338 U.S. 160, 176 (1949)); *Wilbon v. Plovanich*, No. 12 C 1132, 2015 WL 4080169, at *4 (N.D. Ill. July 6, 2015) ("Police officers, of course, sometimes make mistakes. If the mistake (whether of law or of fact) is objectively reasonable, an officer acting in error has not violated the Constitution.") (citing *Heien v. North Carolina*, 135 S. Ct. 530, 532–33, 536 (2014)).

Plaintiffs go on to argue, however, that even if Castrejon recorded the officers' conversations for purposes of the eavesdropping law, the recording was nonetheless

lawful by virtue of a specific exception in the statute. In particular, plaintiffs invoke the statute's so-called "fear of crime" exemption, which permits the "[r]ecording of a conversation made by or at the request of a person ... who is a party to the conversation, under reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense" and where "there is reason to believe that evidence of the criminal offense may be obtained by the recording." 720 ILCS 5/14-3(i). According to plaintiffs, Castrejon reasonably suspected at the time he recorded the video that the officers were about to engage in criminal activity (i.e., another "Rodney King" incident) and wanted to obtain evidence of the crime.

This argument is no more persuasive than the first. To defeat defendants' qualified immunity defense on this ground, plaintiffs must show that, at the time of Castrejon's arrest, it was clearly established that his recording fell within the eavesdropping statute's fear-of-crime exception. To make this showing, plaintiffs must either cite a clearly analogous case on point or demonstrate that Kruger's conduct was so egregious that no reasonable person could have failed to see that it violated Castrejon's rights. *See, e.g.*, *Beaman*, 776 F.3d at 508–09. Once again, plaintiffs opt for the second tack. Their argument is based on Castrejon's references to Rodney King during the recording. According to plaintiffs, Castrejon's remarks leave no doubt that he was recording the officers because he feared they were about to turn violent.

As previously noted, the parties hold sharply different views regarding how Castrejon's statements are to be understood, and indeed about what Castrejon actually said. Plaintiffs claim that Castrejon said, "It's going to be some Rodney King." Pls.'

Resp. Br. at 2. Defendants claim that Castrejon said, "[L]et's see some Rodney King shit up in here!" *See* Defs.' Reply Br. at 4. Because factual disputes in the summary judgment context are to be resolved in the nonmoving party's favor, I might ordinarily be required simply to accept plaintiffs' account of Castrejon's statements. As the Supreme Court has explained, however, only *genuine* factual disputes must be resolved in favor of the nonmoving party. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.") (quoting Fed. Rule Civ. Proc. 56(c)). Thus, the Court has held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*; *see also Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) ("When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape.").

Here, there can be no genuine dispute over what Castrejon actually said: plaintiffs' account of Castrejon's statements is flatly contradicted by the video. At about four seconds into the recording, Castrejon unmistakably says, "Right, right .... Let's see some Rod-- Let's see some Rodney King shit up in this mother. Some Rodney King shit up in this mother." Ex. E. Later, at about twenty seconds into the recording, he says, "Rodney King, baby. Yeah, yeah, yeah." *Id*. Still later, Castrejon can be heard making

derogatory remarks about the police in Spanish.[6] Significantly, plaintiffs do not support their characterization of Castrejon's remarks by citing to the recording itself. Instead, they rely entirely on Castrejon's deposition testimony regarding what he said.

Given this discrepancy, I may rely on the recording rather than plaintiffs' account of Castrejon's statements. I may do so, however, only if there is no reason to doubt the recording's accuracy. *See Scott*, 550 U.S. at 378 (relying on video instead of plaintiff's version of events was because "[t]here [we]re no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened"). Here, a potential problem arises: during his deposition, Castrejon questioned the accuracy of the recording. After viewing the video at his deposition, Castrejon acknowledged that the statement heard on the recording was, "Right, right. Let's see some Rodney King shit up in here," Defs.' Ex. C at 57:3-7. Nevertheless, he insisted that what he had actually said was, "Right, right. It's going to be some Rodney King shit." *Id*. at 57:1-2. When asked to explain the inconsistency, Castrejon speculated that the recording had been tampered with. *Id*. at 57:12-19 ("Q. So is it your testimony that this audio is somehow different [from what you said]? A. Yes. Q. Or doctored? A. Yes. Q. It's your claim that that is not what you were saying on the audio? A. Yes."); *see also id*. at 58:7-10 ("Q. Do you have any explanation as to why the audio would say something different than you claim you said? A. Manufacturing the

---

[6] *See* Defs.' Ex. C, Castrejon Dep. at 61:1-17 ("Q. Okay. We hear a sentence or whatever in Spanish? A. Yes. Q. And is that you? A. Yes. Q. Okay. And what were you saying? A. ... These guys are getting stupid or I say pendejo. There's different meanings to that. These guys are getting ignorant. Q. There's one meaning of pendejo that means assholes, true? A. Yeah. Q. And is that the meaning that you were using for that word? A. Yes.").

audio."); *id*. at 127:7-9 ("Q. Okay. And it's your testimony that you were not trying to incite people or rile people by walking around with your cell phone and making Rodney King type comments? A Yeah. No, I was saying it's going to be some - you know, not see some. Like I said, it was manufactured, you know."). Indeed, Castrejon adhered to this theory even after admitting that the video played during his deposition was the same one that had been played, apparently without objection, at his criminal trial. *Id*. at 58:4-6.

However, while Castrejon's testimony might otherwise raise a factual dispute regarding the recording's accuracy, that is not the case here. Significantly, nowhere in their opposition to the summary judgment motion do plaintiffs make any reference to Castrejon's suggestion that the recording might have been altered. On the contrary, plaintiffs appear to have taken great pains when citing Castrejon's deposition to avoid his remarks on this point. Nor do plaintiffs' response brief or Local Rule 56.1 statement contain any hint of the notion that the recording might be less than veridical. (Defendants, for their part, are likewise silent on the matter). Accordingly, plaintiffs have forfeited any argument concerning the recording's accuracy, *see, e.g*., *Salas v. Wisconsin Dep't of Corr*., 493 F.3d 913, 924 (7th Cir. 2007), and for purposes of this motion, I confine myself to the position advanced in plaintiffs' brief and Local Rule 56.1 Statement, *see, e.g*., *Bilal v. Rotec Indus., Inc*., 326 F. App'x 949, 956 (7th Cir. 2009) (observing that "district courts are not obliged to go beyond parties' Rule 56.1 statements by conducting their own investigation of the record" and that courts have the "discretion to limit their consideration to parties' Local Rule 56.1 submissions"). Thus, because plaintiffs' characterization of Castrejon's statements is inconsistent with the

recording, I rely on the recording. *See, e.g.*, *Scott*, 550 U.S. at 380; *Williams*, 809 F.3d at 942.

Based on Castrejon's comments as they are documented in the video, Kruger could reasonably have believed that Castrejon was recording the officers for reasons other than his fear for his safety and his desire to capture evidence of police misconduct. In fact, an officer in Sergeant Kruger's position could reasonably have arrived at precisely the opposite conclusion: that Castrejon began recording in an attempt to provoke a confrontation with the police. In both tone and substance, Castrejon's comment, "Let's see some ... Rodney King shit up in this mother," can naturally be understood as *encouraging* the officers to respond aggressively to the situation. His statement, "Rodney King, baby. Yeah, yeah, yeah," could likewise reasonably have been viewed as an attempt to goad the officers into violence. This is not to say that it would be impossible for any reasonable person to conclude based on the recording that the fear of crime exception applied in this instance – i.e., that Castrejon made the recording to document another potential "Rodney King incident." For purposes of the qualified immunity inquiry, however, the question is merely whether a person could reasonably (even if perhaps mistakenly) conclude that the exception did *not* apply and that probable cause therefore existed. The answer to that question is yes.

In sum, plaintiffs have failed to show that Sergeant Kruger lacked arguable probable cause to arrest Castrejon for violating the eavesdropping statute. On this record, Kruger could reasonably have believed that the oral communications recorded by Castrejon constituted "conversations" for purposes of the statute. Kruger could likewise reasonably have believed that the recording did not fall within the statute's fear-

of-crime exception. It follows that defendants are entitled to qualified immunity with respect to Castrejon's false-arrest claim. And, as already explained, the same conclusion follows *a fortiori* for Castrejon's failure-to-intervene claim and his illegal-pretrial-detention claim. Thus, defendants' motion for summary judgment as to these claims is granted.

**B.      Castrejon's and Nazario's Claim for Conspiracy**

In Count IX, Castrejon and Nazario assert a claim for civil conspiracy under Illinois law. "Civil conspiracy is defined as 'a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.'" *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (quoting *Buckner v. Atlantic Plant Maintenance, Inc.*, 694 N.E.2d 565 (Ill. 1998)). Thus, "to state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement." *Id.* (citing *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888 (Ill. 1994)).

Plaintiffs allege that the officers conspired to maliciously prosecute Castrejon and Nazario. (Although the complaint alleges malicious prosecution on behalf of all of the plaintiffs, the alleged conspiracy to engage in malicious prosecution is asserted only by Castrejon and Nazario). According to plaintiffs, the purpose of the conspiracy was to cover up the officers' use of excessive force in arresting the plaintiffs. *See* Pls.' Resp. Br. at 12 n.5 (contending that the "unlawful purpose of maliciously prosecuting Plaintiffs was to cover-up Defendants' use of excessive force," and the "tortious act in furtherance of the conspiracy, was the malicious prosecution itself").

In support of the conspiracy claim, plaintiffs point to evidence of various ways in which the officers worked together to advance Castrejon's and Nazario's prosecution on the various offenses they were charged with. For example, they point to testimony by one of the officers that he conferred with other officers at the police station following plaintiffs' arrest, so that he "could, you know, know the story and know the probable cause to complete the arrest reports." Pls.' Ex. R, R. Delany Dep. at 25:7-9. Plaintiffs also cite the fact that many of the criminal complaints filed by the officers contained identical or almost identical language. Additionally, plaintiffs point to testimony by various officers that they met as a group with attorneys (including prosecutors from the State's Attorney's Office) to discuss the case against Castrejon and Nazario. Above all, plaintiffs contend, the conspiracy is demonstrated by the fact that the defendants' charges against Castrejon, Nazario, and the other plaintiffs were false. If none of the plaintiffs committed any offenses, they argue, the fact that they were nonetheless charged with crimes, and the fact that so many officers were involved, is difficult to explain without a conspiratorial agreement of some kind.

Defendants' argument for summary judgment on the conspiracy claim is exceedingly narrow: they challenge the sufficiency of the foregoing evidence only as to the *agreement* element of the claim. It is impractical, however, if not impossible, to assess the "agreement" element of the claim in isolation from its other elements. It makes little sense, for example, to ask whether defendants reached an "agreement" in the abstract. The officers may have agreed about any number of things in connection with Castrejon's and Nazario's arrests. For example, they may have reached an agreement regarding who would transport them to the police station or who would

process them once they arrived. Obviously, defendants' agreement about issues of this sort is irrelevant to the conspiracy claim. For purposes of establishing a conspiracy, the question is whether defendants agreed specifically to maliciously prosecute Castrejon and Nazario.

That issue cannot meaningfully be addressed without addressing the merits of plaintiffs' underlying malicious-prosecution claim. If plaintiffs were not in fact maliciously prosecuted, their conspiracy claim fails as a matter of law. *See, e.g.*, *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000) ("[A] conspiracy is not an independent tort. Where ... a plaintiff fails to state an independent cause of action underlying its conspiracy allegations, the claim for a conspiracy also fails.") (citing *Adcock*, 645 N.E.2d at 888). On the other hand, as already noted, if Castrejon and Nazario were maliciously prosecuted, the number of officers involved in bringing the false charges against them (and the other plaintiffs) is suggestive of a conspiracy. Plaintiffs' conspiracy claim similarly implicates the merits of their excessive-force claim, given plaintiffs' theory that the officers hatched the conspiracy to cover up their use of excessive force.

Further, even if it might be conceptually feasible to address the agreement element of the conspiracy claim apart from the claim's other elements – and the conspiracy claim apart from the malicious-prosecution and excessive-force claims – defendants have offered no particular reason for doing so. For example, there is no reason to believe that deciding the conspiracy claim at this juncture will lead to more efficient resolution of the case. Regardless of the conspiracy claim's disposition, a trial will be necessary to adjudicate the merits of plaintiffs' remaining claims. While

defendants have won summary judgment as to Castrejon's claims for false arrest, failure to intervene, and illegal pretrial detention, those claims remain in play as to other plaintiffs. And Castrejon's and other plaintiffs' claims for excessive force, malicious prosecution, assault, and battery will go forward as well. Given defendants' assertion of qualified immunity, there was an important reason for deciding the summary judgment motion as to Castrejon's federal claims in Counts II, III, and IV. *See, e.g.*, *Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013) ("[I]deally an immunity defense should be resolved at the earliest stage possible."). But this reason does not apply to the conspiracy claim, which is asserted under state law and which is not subject to the qualified immunity defense.

In short, under these circumstances, adjudication of the conspiracy claim is best deferred until it can be addressed in tandem with plaintiffs' malicious-prosecution and excessive-force claims. *Cf. Jacob v. Killian*, 437 F. App'x 460, 467 (6th Cir. 2011) ("[T]he court may decline to decide a specific factual issue ... because the court 'may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.'") (quoting Fed. R. Civ. P. 56 Advisory Committee Notes); 11 Moore's Federal Practice - Civil § 56.07 (2019) (noting that "[h]istorically ... courts have had some discretion to deny an otherwise proper summary judgment motion on the grounds that ... [f]urther pretrial activity or trial adjudication will sharpen the facts and law at issue and lead to a more accurate or just decision.").

In sum, I decline to address defendants' motion for summary judgment as to Count IX and accordingly deny the motion as to that count.

III.

For the reasons discussed above, defendants' motion for summary judgment is granted as to Counts II, III, and IV, insofar as they are asserted by Castrejon. I decline to address the conspiracy claim asserted by Castrejon and Nazario and therefore deny the motion as to Count IX.

**Elaine E. Bucklo**
United States District Judge

Dated: July 24, 2019